United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 11, 1997 Decided November 7, 1997 

 No. 96-7270

 Madison Hotel, 

 Appellee

 v.

 Hotel and Restaurant Employees, Local 25, 

 AFL-CIO, 

 Appellant

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 96cv01433)

 Mady Gilson argued the cause for the appellant. David 
M. Silberman and Francis R. Sheed were on brief.

 Jonathan W. Greenbaum argued the cause for the appel-
lee.


 Before: Sentelle, Henderson and Randolph, Circuit 
Judges.

 Opinion for the court filed by Circuit Judge Henderson.

 Dissenting opinion filed by Circuit Judge Randolph.

 Karen LeCraft Henderson, Circuit Judge: Appellant Ho-
tel and Restaurant Employees Local 25 (Union) seeks rever-
sal of the district court's summary judgment vacating two 
awards of the Arbitrator in the Union's favor. Because we 
agree with the district court that the awards exceeded the 
scope of the Arbitrator's authority, we affirm the judgment.

 The facts, as found by the Arbitrator, are undisputed. In 
July 1992 the Madison Hotel (Hotel) eliminated its food 
service bus positions and shifted bus responsibilities to its 
waiters. The Union, which represented a bargaining unit 
that included the Hotel's waiters and bus employees, filed a 
grievance on behalf of the laid-off employees. On July 24, 
1992 the grievance was submitted to arbitration pursuant to 
the collective bargaining agreement.

 On January 2, 1994 the Arbitrator issued a decision in favor 
of the grievants. In the decision the Arbitrator framed the 
"issue" as follows:

 Whether the Hotel violated the Agreement by its 
 abolishment of the Bus Employee position, its transfer of 
 the duties of the Bus Employees to other positions and 
 its layoff of the Grievants in July 1992 and, if so, what is 
 the appropriate remedy?

JA 19. The Arbitrator balanced the Hotel's management 
rights under the collective bargaining agreement 1 against 

__________
 1 The "Management Rights" provision of the agreement grants 
the Hotel "the sole right to direct and control the employees, 
including the right to layoff, promote and transfer." JA 32. Con-
struing this language, the Arbitrator concluded "it properly may be 
implied in the absence of express restrictions elsewhere in the 
Agreement, that the Hotel can reassign duties from one position to 
another, even to the extent of completely eliminating one position." 
Id.


"those provisions which are of great importance to the em-
ployees who have worked at the Hotel for many years, i.e. 
provisions which afford employees rights in the matters of 
seniority, classification, layoff projections, retention of seniori-
ty following a layoff, etc," JA 32.2 He concluded: "For the 
Hotel to take the drastic action of not just laying off employ-
ees during the period of slack business, as contemplated by 
the Agreement, but to instead completely eliminate their 
positions and reassign substantially all of their remaining 
duties to another position, the Hotel must demonstrate a 
legitimate business reason, i.e., a reason beyond mere 'slack-
ness of business,' " a showing he determined the Hotel had 
not made. JA 32. Accordingly, the Arbitrator ordered the 
following remedy:

 The Hotel is directed to reinstate the Grievants to 
 their former positions and to make them whole for all 
 losses, including seniority, attributable to their improper 
 layoff. Pursuant to the Parties [sic] agreement to bifur-
 cate this proceeding, the Parties are directed to attempt 
 to resolve this matter and, if unsuccessful, either Party 
 may return this matter to the Arbitrator for further 
 proceedings with respect to the remedial aspects only.

JA 36.

__________
 2 The Arbitrator specifically cited section 12.2(a) of the collective 
bargaining agreement which provides:

 (a) It is recognized that the principle of seniority shall 
 normally be followed when it becomes necessary to layoff [sic] 
 employees due to slackness of business.

JA 78. Section 12.2(b) explains section 12.2(a):

 

 (b) That is, normally, the employee on duty in the station in 
 which the reduction is being made having a shorter period of 
 continuous service shall be laid off before any other employee 
 having a longer period of continuous service; and preference to 
 laid off employees shall be given in reemployment within the 
 particular station or category.

Id.


 When it turned out that none of the grieving bus employees 
desired reinstatement,3 the Hotel took the position that the 
dispute was at an end while the Union insisted that the 
Arbitrator's award required that the bus positions be reestab-
lished and filled by new employees. On December 14, 1994 
the Union wrote the Arbitrator requesting "clarification" of 
the matter. After receiving a response from the Hotel, the 
Arbitrator decided by letter dated February 6, 1995 that, 
despite the mootness of the bus employees' grievance, the 
Hotel was required to reestablish the positions because his 
original decision treated the abolition of positions and the 
layoff of the grievants as separate elements in both the 
statement of the "issue," which characterized them as distinct 
violations of the agreement, and the remedy, which "necessar-
ily" contemplated that the positions be reestablished before 
the employee grievants were reinstated. The Arbitrator then 
concluded:

 At the point of offering each identified Grievant rein-
 statement to the restored Bus Employee positions, if any 
 such offer to fill one of these restored positions is not 
 accepted by a Grievant, such restored position becomes a 
 vacancy subject to being filled in accordance with the 
 applicable provisions of the Agreement. A restored posi-
 tion cannot be eliminated solely because a Grievant elect-
 ed not to accept the offer to be reinstated in such 
 position.

JA 39.

 On April 18, 1995 the Union filed an action in the district 
court to enforce the Arbitrator's award. On February 13, 
1996 the district court dismissed the action for lack of juris-
diction, concluding it was "not ripe for adjudication" because 
the Arbitrator had "not issued a final remedial order." 955 
F. Supp. at 2.

__________
 3 Most of the grievants had accepted a monetary award in lieu of 
reinstatement pursuant to a settlement in an unrelated employment 
discrimination action against the Hotel. Other grievants had ob-
tained employment on the Hotel's staff of waiters.


 On June 6, 1996 the Arbitrator issued a final remedial 
order, reaching the same conclusion as he had in the Febru-
ary 6, 1995 letter. The Arbitrator again asserted that his 
statement of the "issue" in his original (January 2, 1994) 
decision treated separately the abolition of positions and the 
layoff of the grievants. He then characterized the original 
remedy as "an attempt to recreate the status quo ante the 
Hotel's violation of the Agreement," namely "restaurant and 
Room Service facilities which operated with Bus Employees," 
JA 48, and observed that "the Hotel never has returned to 
the status quo ante," JA 49. The Arbitrator determined that 
his original decision had "necessarily found that the bargain-
ing unit employees generally, as well as the specific individu-
als who filed the grievance, have a seniority right to have as 
many positions in the bargaining unit as possible in which to 
bump in the event of an economic layoff pursuant to the 
provisions of Article 12, Section 12.2(a)" of the collective 
bargaining agreement. JA 48. According to the Arbitrator, 
"[t]he Union, as the representative of all of the unit employ-
ees, has an interest in protecting the seniority rights of all of 
the unit employees and preserved its right to do so in this 
case by raising in this grievance the issue of the abolishment 
of the classification as well as the layoff of the particular 
Grievants." JA 48. Finally, the Arbitrator stated: "The 
Hotel ... has not identified any 'changed circumstances', 
other than the passage of time, nor has the Hotel identified 
any legitimate business reasons which occurred since the 
classifications improperly were abolished which after-the-
violation business reasons, arguably, would mitigate against a 
remedial order requiring the Hotel to reinstate the classifica-
tion and to fill it until such time as the Hotel has a proper 
justification for abolishing it." JA 49. The Arbitrator then 
issued the following final award:

 The Hotel is directed to reinstate the Bus Employee 
 classification for its restaurant outlets and for its Room 
 Service operations and to fill the number of Bus Employ-
 ee positions in each area which existed at the time of the 
 layoff and to operate with such Bus Employee classifica-


 tions until it can demonstrate an appropriate basis, under 
 the Agreement, to abolish such positions.

JA 49.

 On June 20, 1996 the Hotel filed an action to vacate the 
Arbitrator's award and the Union counterclaimed for enforce-
ment. On cross-motions for summary judgment, the district 
court granted judgment in the Hotel's favor on December 17, 
1996, concluding that the Arbitrator "exceeded the scope of 
his jurisdiction, both by deviating from the issues submitted 
for arbitration and by issuing an award that does not draw its 
essence from the parties' agreement." Madison Hotel v. 
Hotel & Restaurant Employees Local 25, 955 F. Supp. 1, 3 
(D.D.C. 1996). The Union appeals the judgment. We con-
clude that the district court correctly held the Arbitrator's 
final award went beyond the scope of his authority, which was 
limited to arbitrating the laid-off bus employees' grievance.4

 The "scope of review of an arbitrator's award interpreting a 
collective bargaining agreement is extremely narrow." 
American Postal Workers Union v. United States Postal 
Serv., 52 F.3d 359, 361 (D.C. Cir. 1995) (citing United Steel-
workers of America v. American Mfg. Co., 363 U.S. 564, 567 
(1960); United Steelworkers of America v. Warrior & Gulf 
Navigation Co., 363 U.S. 574, 578 (1960); United Steelwork-
ers of America v. Enterprise Wheel & Car Corp., 363 U.S. 
593, 597 (1960)). " '[A] labor arbitration award must be 
enforced if the arbitrator acts within the confines of his 
jurisdiction and his award draws its essence from the parties' 
collective bargaining agreement; this is so even when a 
reviewing court disagrees with the arbitrator's judgment on 
the merits.' " United States Postal Serv. v. National Ass'n of 
Letter Carriers, 810 F.2d 1239, 1241 (D.C. Cir. 1987) (quoting 
Northwest Airlines v. Air Line Pilots Ass'n, 808 F.2d 76, 78 

__________
 4 Because we affirm on this ground we need not address the 
district court's alternative holding, that the award did not draw its 
essence from the collective bargaining agreement. Nor do we 
express any opinion on the merits of the Arbitrator's interpretation 
of the contract based on the rights of the Union and non-bus 
employees.


(D.C. Cir. 1987), cert. denied, 486 U.S. 1014 (1988)). Never-
theless, " 'arbitration is a matter of contract and a party 
cannot be required to submit to arbitration any dispute which 
he has not agreed so to submit.' " AT&T Technologies, Inc. 
v. Communications Workers of Am., 475 U.S. 643, 648 (1986) 
(quoting United Steelworkers v. Warrior & Gulf, 363 U.S. at 
582); see Davis v. Chevy Chase Fin. Ltd., 667 F.2d 160, 165 
(D.C. Cir. 1981) (citing United Steelworkers v. Warrior & 
Gulf, 363 U.S. at 582) ("[A]rbitration is, however, a matter of 
contract, and the contours of the arbitrator's authority in a 
given case are determined by reference to the arbitral agree-
ment."). Thus, "[t]here is no duty to arbitrate matters not 
subject to the arbitration agreement, and no authority on the 
part of arbitrators to consider matters not necessary to the 
resolution of disputes actually submitted." Williams v. E.F. 
Hutton & Co., 753 F.2d 117, 119 (D.C. Cir. 1985) (citing 
Davis, 667 F.2d at 165). "In determining the scope of an 
arbitrator's authority we look to two sources: the collective 
bargaining agreement, and the submission of the parties to 
the arbitrator." Washington-Baltimore Newspaper Guild, 
Local 35 v. Washington Post Co., 442 F.2d 1234, 1236 (D.C. 
Cir. 1971); see also Piggly Wiggly Operators' Warehouse, 
Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck 
Drivers Union, Local No. 1, 611 F.2d 580, 584 (5th Cir. 1980) 
("However, once the parties have gone beyond their promise 
to arbitrate and have actually submitted an issue to an 
arbiter, we must look both to their contract and to the 
submission of the issue to the arbitrator to determine his 
authority."). Accordingly, we now examine the arbitration 
provisions in the collective bargaining agreement and the 
grievance as submitted by the Union to the Arbitrator to 
determine the intended scope of the arbitration.

 We first consider the parties' agreement. "[T]he question 
of arbitrability--whether a collective-bargaining agreement 
creates a duty for the parties to arbitrate the particular 
grievance--is undeniably an issue for judicial determination. 
Unless the parties clearly and unmistakably provide other-
wise, the question of whether the parties agreed to arbitrate 
is to be decided by the court, not the arbitrator." AT&T 


Technologies, 475 U.S. at 649. The agreement here provided 
only very generally for arbitration of "a grievance or misun-
derstanding aris[ing] out of and during the term of [the] 
agreement" provided the grievance is not first resolved by the 
"joint grievance subcommittee." Collective Bargaining 
Agreement s 17.1 (filed July 9, 1996 in district court as 
attachment 1 to defendant's Answer & Counterclaim). The 
issue the Arbitrator ultimately resolved below--whether the 
Union or its non-busing members have a right to reestablish-
ment of the bus positions--seems to come within the broad 
class of subjects arbitrable under the agreement. We must 
next look at the grievance as submitted by the parties to the 
Arbitrator to determine how it further limits the scope of the 
arbitration.

 The Union commenced the arbitration on July 24, 1992, 
filing with the Arbitrator a letter addressed to the Hotel's 
Managing Director which stated that the Union was "oppos-
ing and taking to arbitration the action taken by your estab-
lishment against the above captioned employee." Arbitration 
Letter (filed Sept. 12, 1997) (emphasis added.) The caption 
identified the grievant "employee" as "Bus employees/Local 
25 members." Id. Thus, the letter manifests that the griev-
ance was taken to arbitration only on behalf of the bus 
employees in Local 25 and not on behalf of the Union itself or 
of non-bus employees, as the district court concluded.5

 The Union contends the letter is irrelevant because it is an 
"informal" document largely ignored by the parties them-
selves. The Arbitrator, however, apparently considered the 
letter of significance, describing the nature of the grievance 
by reference to it and noting in the first sentence of his 
original decision that its filing on July 24, 1992 was "on behalf 
of" each of the individually named grieving bus employees. 
JA 18. Nevertheless, even without the letter we would be 
bound to conclude, based on the Arbitrator's decisions, that 
arbitration was sought on behalf of the named individual 

__________
 5 The arbitration letter was filed with this court after oral argu-
ment and was not before the district court.


grievant bus employees only and that its scope was limited 
thereby.

 If there is in fact no written submission to the Arbitrator 
specifying the issue to be resolved, the scope of arbitration 
must be determined from the conduct of the parties. Matte-
son v. Ryder Sys. Inc., 99 F.3d 108, 114 (3d Cir. 1996); 
International Chem. Workers Union, Local No. 566 v. Mobay 
Chem. Corp., 755 F.2d 1107, 1110 (4th Cir. 1985); Ficek v. 
Southern Pac. Co., 338 F.2d 655, 656 (9th Cir. 1964), cert. 
denied, 380 U.S. 988. Here the parties' conduct in pursuing 
the arbitration, insofar as it is discernible from the Arbitra-
tor's determinations, manifests an intent, at least at the time 
of the submission and original hearing, to limit arbitration to 
a resolution of the individual grievants' rights.

 The Arbitrator's original decision plainly recites that the 
grievance was "filed ... on behalf of" the eight named 
grievants, as we noted above, and that each grievant "was 
employed as a Bus Employee at the Madison Hotel." JA 18. 
In the decision the Arbitrator identified the abolition of 
positions and the layoffs (as well as the transfer of duties) as 
a single "issue" for which he needed to ascertain a single 
"appropriate remedy," JA 19. He resolved the issue by 
recourse to the reasonable expectation of a classification's 
laid-off employees (here the bus employees) that they would 
be recalled when business improved and the frustration of the 
expectation "if the classifications completely are eliminated at 
the time of the layoff." JA 33. Significantly, however, the 
decision made no mention of the rights or expectations of 
employees in other classifications not subject to layoff and 
elimination, such as the non-bus unit employees here on 
whose rights the Arbitrator based his determination in his 
final remedial order that the remedy remained in force 
despite the departure of all of the grieving bus employees. 
Finally, the remedy the Arbitrator originally fashioned simply 
directed the Hotel "to reinstate the Grievants to their former 
positions and to make them whole for all losses, including 
seniority, attributable to their improper layoff." JA 36 (em-
phasis added). In short the entire focus of the decision was 
the grievance of the laid-off bus employees. Nothing in the 


original decision suggests that the Arbitrator or the parties 
intended the arbitration to extend beyond settling that griev-
ance and fashioning a remedy, if appropriate, for the griev-
ants.

 Despite the undisputed and limited scope of his original 
decision, the Arbitrator purported to construe its language 
post hoc to expand the arbitration to encompass the relief 
granted in his final award. As noted above, he reinterpreted 
the statement of issue in the original decision to make rees-
tablishment of busing positions and layoff of the grievants 
separate issues. In addition, the Arbitrator's February 6, 
1995 letter decision concluded that the original remedy "nec-
essarily intended that the Hotel reinstate the Bus Employee 
classification for the requisite number of positions equivalent 
to the number of Bus Employee positions which existed 
before the improper elimination of the classification and the 
subsequent layoff of the incumbent Bus Employees." JA 39. 
The June 6, 1996 final order went further and, as we stated 
earlier, characterized the original decision as having "neces-
sarily found" that "the bargaining unit employees general-
ly"--not only the laid-off bus employees on whose behalf the 
grievance was expressly brought--had seniority rights in the 
abolished positions and that the Union, "as the representative 
of all of the unit employees," had an interest in protecting 
those rights through arbitration. JA 48. This broad con-
struction of the arbitration's scope is at odds with the Arbi-
trator's original view that it was limited to the bus employees' 
grievance--a view he acknowledged in his later two decisions.

 In his February 6, 1995 letter, the Arbitrator expressly 
recognized that "[t]he remedy set forth in the [January 2, 
1994] Opinion contemplated reinstatement of, and a make 
whole award to, the identified Grievants only." JA 39 (em-
phasis in original). In the same letter the Arbitrator also 
confirmed that the intent of the parties to the arbitration had 
been to provide a remedy for the grievant employees alone. 
See JA 39 ("[N]othing in this Arbitration proceeding raised, 
or was intended to resolve, any issue with respect to any 
potential remedy to any individuals other than the identified 
Grievants."). JA 39. Similarly, in his June 6, 1996 order, the 


Arbitrator acknowledged that "in finding the violation, [he] 
balanced Management's right to manage, including the right 
to determine staffing, against the Grievants' seniority rights," 
not the rights of other employees. JA 48 (emphasis added). 
It is clear, then, that throughout the proceeding the Arbitra-
tor adhered to the view that he and the parties conducted the 
arbitration, at least up through the time of the original award, 
as limited to resolving the grievance filed on behalf of the 
laid-off bus employees. Given his undisputed perception of 
the arbitration's limited scope at the time of the initial award, 
we cannot credit the Arbitrator's subsequent usurpation of 
authority to arbitrate the rights of non-bus (non-grieving) 
employees, and through them of the Union itself, and to issue 
a remedy for the breach of those rights. Such a remedy 
necessarily exceeds the scope of the arbitration brought and 
maintained on behalf of the laid off bus employees, as the 
Arbitrator himself perceived it.

 We are aware that an arbitrator's interpretation of the 
scope of the submission generally receives the same defer-
ence accorded his interpretation of the collective bargaining 
agreement. See El Dorado Technical Servs., Inc. v. Union 
General De Trabajadores de P.R., 961 F.2d 317, 321 (1st Cir. 
1992); Richmond, Fredericksburg & Potomac R.R. v. Trans-
portation Communications Int'l Union, 973 F.2d 276, 280 
(4th Cir. 1992); Pack Concrete, Inc. v. Cunningham, 866 F.2d 
283, 285 (9th Cir. 1989); High Concrete Structures, Inc. of 
N.J. v. United Elec. Radio & Mach. Workers of Am., Local 
166, 879 F.2d 1215, 1219 (3d Cir. 1989); Cement Divs., Nat'l 
Gypsum Co. v. United Steelworkers of Am., Local 135, 793 
F.2d 759, 765 (6th Cir. 1986). And we have, accordingly, 
accepted the Arbitrator's original view, as he consistently 
characterized it throughout, that the arbitration was brought 
on behalf of and to provide a remedy for the named grievants 
only--a view that accords with the text of the submission 
letter and which we must assume reflects the intent of the 
parties as expressed in their briefs and at the hearing. 
"Judicial deference to arbitration, however, does not grant 
carte blanche approval to any decision an arbitrator might 
make." Piggly Wiggly Operators' Warehouse, Inc., 611 F.2d 


at 583. "[T]he courts are neither entitled nor encouraged 
simply to 'rubber stamp' the interpretations and decisions of 
arbitrators." Matteson, 99 F.3d at 113. They can and do 
decline enforcement of awards if an arbitrator exceeds his 
authority by arbitrating issues not submitted by the parties. 
See, e.g., Matteson, 99 F.3d at 113-15; Hardin's Bakery, Inc. 
v. Retail, Wholesale, & Dep't Store Union, 877 F.2d 1541, 
1544-45 (11th Cir. 1989); John Morrell & Co. v. Local Union 
304a of the United Food & Commercial Workers, 913 F.2d 
544, 559-61 (8th Cir. 1989), cert. denied, 500 U.S. 905; Bowa-
ter Carolina Co. v. Rock Hill Local Union No. 1924, 871 F.2d 
23 (4th Cir. 1989); Courier-Citizen Co. v. Boston Electrotyp-
ers Union No. 11, 702 F.2d 273, 280-82 (1st Cir. 1983); cf. 
Davis v. Chevy Chase Fin. Ltd., 667 F.2d 160, 164-68 (D.C. 
Cir. 1981) (holding that arbitrator exceeded authority under 
limited arbitration clause in employment contract). We do so 
here. We cannot defer to the Arbitrator's ultimate assertion 
that the arbitration encompassed the abolition of the classifi-
cation apart from the rights of the named grievants and that 
his original award "necessarily" contemplated remedies for 
non-grievants. The Arbitrator's post hoc position cannot be 
"rationally derived" from his contemporaneous view of the 
parties' submission as limited to the grievants' rights and 
remedies. See Richmond, Fredericksburg & Potomac R.R., 
973 F.2d at 280; High Concrete Structures, 879 F.2d at 1219.

 Because the Arbitrator exceeded the arbitral authority 
conferred by the parties, the judgment of the district court 
vacating the February 6, 1995 and June 6, 1996 arbitral 
awards is

Affirmed.



 Randolph, Circuit Judge, dissenting: My colleagues be-
lieve the arbitrator's remedy--the hotel shall restore the 
classification it unilaterally abolished--was outside the scope 
of the arbitration. In support, they point to the union's letter 
starting the arbitration, and to the arbitrator's initial opinion. 
I have five points in opposition.

 First, the union's letter signaling the beginning of arbitra-
tion tells us nothing of particular significance. It states that 
"pursuant to our collective bargaining agreement," the union 
"is opposing and taking to arbitration the action taken by 
your establishment against the above-captioned employee." 
Letter from Richardson to Jacques of 7/24/92, at 1 (italics 
added). Now we know that the grievance was not just for 
one employee, so right from the start the letter loses any 
claim to being the definitive guide to the scope of the arbitra-
tion that eventually followed.

 Little wonder then that the union treats its letter as 
unimportant. The hotel did so too, and said as much at oral 
argument. The letter was not before the district court, it was 
not part of the record before us, and when my colleagues 
asked for a copy during argument, the parties were not at all 
sure they could find one.

 The complaint, according to the union's letter, is merely 
"Improper Layoff." Id. There is no elaboration, no citation 
to any part of the labor contract, nothing. How then can one 
say on the basis of this letter that the arbitrator misinterpret-
ed the scope of the issues? The arbitrator listened to the 
parties, he read their submissions, he heard their evidence. 
And he presumably knew the customary manner in which 
union and management treat such informal proceedings. We 
decidedly do not.

 Second, considerations such as those just mentioned are 
partly behind the settled law that an arbitrator's interpreta-
tion of the scope of the issues submitted to him for arbitration 
gets the same deep judicial bow as an arbitrator's interpreta-
tion of a collective bargaining agreement. See, e.g., Sheet 
Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison 
Indus., 84 F.3d 1186, 1190 (9th Cir. 1996); El Dorado Techni-


cal Servs. v. Union General de Trabajadores de Puerto Rico, 
961 F.2d 317, 321 (1st Cir. 1992); Lattimer-Stevens Co. v. 
United Steelworkers of America, Dist. 27, Sub-Dist. 5, 913 
F.2d 1166, 1170 (6th Cir. 1990); Mobil Oil Corp. v. Indepen-
dent Oil Workers Union, 679 F.2d 299, 302 (3d Cir. 1982); 
Waverly Mineral Products v. United Steelworkers of Amer-
ica Local No. 8290, 633 F.2d 682, 685-86 (5th Cir. 1980). 
This rule of deference also rests on federal labor policy, 
judicial economy, and the Supreme Court's directive that 
"when the subject matter of a dispute is arbitrable, 'procedur-
al' questions which grow out of the dispute and bear on its 
final disposition are to be left to the arbitrator." United 
Paperworkers Int'l Union v. Misco, 484 U.S. 29, 40 (1987) 
(citing John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 
557 (1964)).

 If an arbitrator's interpretation gets the "greatest defer-
ence imaginable," Utility Workers Union of America, Local 
246, AFL-CIO v. NLRB, 39 F.3d 1210, 1216 (D.C. Cir. 1994), 
I see no plausible ground for setting aside this arbitrator's 
view of what was before him. Certainly the grievance letter 
cannot shoulder such a heavy load.

 Which brings me to my third point. All indications point 
in favor of the arbitrator's version of the scope of this 
arbitration. Even if we were on a level, no-deference playing 
field, I would find the arbitrator's view far more persuasive 
than the majority opinion's. Consider the context. The hotel 
did two things: it announced an across-the-board layoff of its 
bus employees and it abolished the bus classification. Both of 
the hotel's actions were therefore in play.

 The "on behalf of" language--viewed by my colleagues and 
the district judge as critical--comes from the first paragraph 
of the arbitrator's initial opinion. Now, it seems to me the 
person best situated to pronounce on the import of those 
words is not a judge, but the arbitrator who wrote them. 
And here is what the arbitrator thought. From the second 
paragraph of his opinion onward, the arbitrator treats the 
hotel's unilateral abolishment of the bus employee position as 
a chief topic of dispute between the parties. This is compel-


ling evidence of what the parties believed they were arbitrat-
ing. A court cannot rightly claim to be giving deference to an 
arbitrator when it reaches out so far to overturn him.

 My fourth point is that to restrict the scope of arbitration 
to the union's opening grievance letter is to adopt a formal 
arbitration pleading requirement, judicially monitored--some-
thing like, "The scope of the union's first letter defines the 
scope of the arbitration." Yet I had thought informality was 
one of the hallmarks of this sort of non-judicial dispute 
resolution. The approach my colleagues adopt, if it were to 
have any lasting impact (I cannot imagine that it will), means 
that no longer will the arbitrator hear the parties out, consid-
er the evidence they wish to present, and make a considered 
determination of the scope of the issues before him. Instead 
he will examine only the initial grievance letter, much in the 
manner of a common law judge in Blackstone's time. Such a 
regime, I can say with no exaggeration, flies in the face of, 
contradicts, deviates from, upsets, disregards, conflicts with, 
tosses aside, ignores and repudiates a large portion of the law 
of labor arbitration from the Steelworkers Trilogy on down.

 Indeed, such a regime would impose upon arbitration prac-
tice procedural requirements even stricter than the more 
formal rules governing the trial of a federal civil case. Con-
sider Federal Rule of Civil Procedure 15(b): "When issues 
not raised by the pleadings are tried by express or implied 
consent of the parties, they shall be treated in all respects as 
if they had been raised in the pleadings." Here the union 
and the hotel "tried" the issue of the classification abolish-
ment and the arbitrator issued his findings and conclusions 
about that issue in his initial award. And so, if this had been 
a district court case, the union's grievance letter--its "com-
plaint"--would be deemed to have raised that issue. It is 
utterly incomprehensible that arbitration proceedings should 
be more regimented.

 This brings me to my fifth and final point. My colleagues 
say that the arbitrator's remedy of restoring the bus classifi-
cation fell outside the issues the parties arbitrated and came 
about only "post hoc." This is doubly mistaken. In his initial 


award the arbitrator held, for instance, that "the Hotel violat-
ed the layoff, seniority and classification provisions of the 
Agreement ... insofar as it eliminated completely the Bus 
Employee classification, laid off all of the Bus Employees and 
transferred the substantial remaining Bus Employee duties to 
the Waiters .... Consequently, the Hotel is directed to 
restore the Bus Employee position, to reinstate the laid off 
Bus Employees and to make them whole for all losses attrib-
utable to the improper layoff." J.A. 31. Having found, as an 
initial matter, that the hotel violated the contract by eliminat-
ing the classification, the arbitrator simply followed elementa-
ry logic in ordering the hotel to restore the classification. It 
is an old rule that the scope of the violation determines the 
scope of the remedy.

 The majority's other error is in supposing that the arbitra-
tor's rulings after his initial award may be dismissed as 
merely "post hoc." After the initial decision, the parties 
returned to the arbitrator for clarification. Parties some-
times do the same thing in this court. The arbitrator issued 
an opinion stating that the bus classification had to be re-
stored. Even then the district court did not think the arbi-
tration proceedings had ended and so, at the district court's 
direction, the parties returned to the arbitrator again for a 
final ruling and again the arbitrator ordered the hotel to 
restore the classification. The majority's post hoc rationale 
thus embodies a legal principle--whatever the arbitrator says 
first in the course of ongoing arbitration proceedings is all 
that counts. There is probably no need to point out that in 
all the annals of arbitration law, this marks the first appear-
ance of such a legal principle. If there is something, anything 
to be said in favor of it, the majority has neglected to 
enlighten us.